IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

NATIVIDAD SILVA,

    Plaintiff,                                                    OPINION AND ORDER

    v.                                                                              16-cv-185-wmc

L.C. WARD, MS. BRAKER and COUNSELOR JAMES,

    Defendants.
_____

Plaintiff Natividad Silva is proceeding in this civil action under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1974), claiming that during his incarceration at the Federal Correctional Institution in Oxford, Wisconsin ("FCI-Oxford"), all defendants housed him in conditions that violated his Eighth Amendment rights; defendant Braker retaliated against him in violation of his First Amendment rights; and defendant Braker discriminated against him on the basis of his race, in violation of his Fifth Amendment rights. Currently before the court is defendants' motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Dkt. #32.) While defendants raise three arguments in support of dismissal, the court finds their first argument dispositive: plaintiff's claims are not cognizable in light of the Supreme Court's decision in *Ziglar v. Abbasi*, -- U.S. --, 137 S. Ct. 1843 (2017).

ALLEGATIONS OF FACT[1]

Silva, who is Hispanic, is currently a federal inmate incarcerated by the Bureau of Prisons at the Federal Medical Center in Rochester, Minnesota ("FMC-Rochester"). Silva was previously incarcerated at the FCI-Oxford, where defendants L.C. Ward was the warden, Ms. Braker was a unit manager, and James was a counselor.

To save money, inmates at FCI-Oxford were informed in very early 2016 that the institution was temporarily closing the Sauk housing unit, where Silva was then placed. In February 2016, Silva asked Counselor James if he could be moved to one of the "better" housing units, because Silva had been bothered by undisciplined inmates and excessive noise. James told Silva that he would speak to Unit Manager Braker. Silva also sent an electronic request to Braker to be considered for "better" housing, specifically requesting that he *not* be placed in the Waushara housing unit, which he considered to be disruptive and unsanitary. In contrast, according to Silva, the Waupaca housing unit was one of the nicer units at FCI-Oxford, because it is quiet and clean, has larger cells, and generally houses inmates with long sentences.

On February 29, 2016, Braker asked the inmates already housed on the Waupaca unit to review requests from inmates who wanted to be transferred there. Despite the inmates in the Waupaca unit allegedly identifying Silva as an inmate who would be compatible on the unit, Braker denied Silva's request to be moved there. Instead, he

---

[1] In addressing any pro se litigant's complaint, the court must read the allegations generously. *Haines v. Kerner*, 404 U.S. 519, 521 (1972). For purposes of this order, the court assumes the facts above based on the allegations in Silva's complaint and supplement, drawing all reasonable inferences in his favor.

allowed three white inmates with unfavorable disciplinary histories to move to that unit.

Worse, on March 2, 2016, Silva was ordered to move to the Waushara housing unit, which he not only *expressly* wanted to avoid, but which is rundown and disproportionately Hispanic. Moreover, when Silva arrived, he found: both the unit and his cell were filthy and smelly; trash was overflowing; mold was on the walls and shower curtains; grease and old food had built up in the sinks; chewing tobacco stains were on the ceiling; and there was dirt everywhere. Finally, Silva was also placed with a cellmate who was not only a gang member, but did not shower or wash his clothes or bedding.

Nevertheless, when Silva and his cellmate approached Counselor James about moving, he rejected their request. Silva then filed a grievance about his cell, which James also rejected, stating that Silva could help "straighten out" his cellmate. James further denied Silva's requests to have his cell cleaned or for cleaning materials. Silva next appealed to Unit Manager Braker and Warden Ward, who both affirmed James's denial of his grievance. Silva also requested another TV for the Waushara unit, as most of the other units had at least two TVs and Waushara's only TV was allegedly old and "burning out." James denied that request as well.

After Silva filed this lawsuit in March of 2016, Braker allegedly also ordered two inmates to verbally threaten him, prompting Silva to amend his complaint to bring a retaliation claim against her. Silva was transferred to FMC-Rochester in May of 2016.

OPINION

A motion to dismiss under Rule 12(b)(6) is designed to test the complaint's legal sufficiency. *See* Fed. R. Civ. P. 12(b)(6). Dismissal is warranted only if no recourse could

3

be granted under any set of facts consistent with the allegations. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007). "To survive a motion to dismiss under Rule 12(b)(6)," a plaintiff must allege sufficient facts to "state a claim for relief that is plausible on its fact." *Spierer v. Rossman*, 798 F.3d 502, 510 (7th Cir. 2015) (citing *Twombly*, 550 U.S. at 570). A Rule 12(b)(6) motion is the proper means for dismissal when *Bivens* does not authorize a claim. *Massey v. Helman*, 196 F.3d 727, 738 (7th Cir. 1999) ("[T]he appropriate basis for dismissing a *Bivens* claim . . . is failure to state a claim upon which relief can be granted . . . ."). That is the case here.

Defendants urge the court to conclude that all of Silva's claims require dismissal because a *Bivens* remedy is inappropriate in these circumstances. In its 2017 *Abbasi* decision, the United States Supreme Court explained that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity," such that the Court "has 'consistently refused to extend *Bivens* to any new context or new category of defendants'" over the past thirty years. 137 S. Ct. at 1857 (internal citations omitted) (collecting cases). In *Abbasi*, the court further established a three-step inquiry that district courts must follow before finding that a *Bivens* remedy exists: (1) whether the claim "presents a new *Bivens* context"; (2) whether there is any "alternative, existing process for protecting the interest" at stake; and (3) whether any other "special factors counsel[] hesitation" before authorizing a new kind of federal litigation. *Id.* at 1856-60. The court addresses each question below.

I. **New *Bivens* Context?**

A constitutional claim presents a new *Bivens* context "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Id.* at 1859.

4

The cases considered for comparison by the *Abbasi* Court were: *Bivens*, 403 U.S. 388 (FBI agents handcuffed a man in his home without a warrant); *Davis v. Passman*, 442 U.S. 228 (1979) (Congressman fired a female secretary); and *Carlson v. Green*, 446 U.S. 14 (1980) (prison officials failed to treat inmate's asthma). *Abbasi,* 137 S. Ct. at 1854-55, 1860, 1864-65. The Court also suggested that "meaningful" differences can be discerned by:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond . . .; the statutory or legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860. The Supreme Court further cautioned that "even a modest extension is still an extension." *Id.* at 1864.

As a result, after *Abbasi*, "additional scrutiny is required before a plaintiff may proceed with a *Bivens* action if the claims arise 'in a new *Bivens* context.'" *Harris v. Dunbar*, No. 2:17-cv-00536-WTL-DLP, 2018 WL 3574736 at *2 (S.D. Ind. July 25, 2018) (quoting *Abbasi*, 137 S. Ct. at 1864) (declining to extend *Bivens* remedy to First Amendment interference with mail and Fifth Amendment due process claims). "[E]ven where a circuit court has previously found a *Bivens* remedy, that court must still consider the availability of an implied right of action in subsequent cases relying on the same precedent." *Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 58 (E.D.N.Y. 2017) (citing *Vanderklok v. United States*, 868 F.3d 189, 199-200 (3d Cir. 2017)), *affirmed in Gonzalez v. Hasty*, 755 F. App'x 67 (2d Cir. 2018) (acknowledging *Bivens* cognizability arguments but concluding that all claims failed on qualified immunity grounds regardless).

In this case, Silva's retaliation, equal protection and conditions of confinement claims are "meaningfully different" from the Fourth, Fifth and Eighth Amendment claims recognized in *Bivens*, *Davis* and *Carlson*. Starting with his Eighth Amendment claim, Silva points to *Carlson* to argue that he is not pursuing a new *Bivens* context, reading *Carlson* far more broadly than authorized by *Abbasi*. In *Carlson*, the Supreme Court authorized federal prisoners to seek compensation for prison officials' failure to provide medical care in violation of the Eighth Amendment, while Silva's Eighth Amendment claim, challenging the conditions of his confinement, involves a different legal standard. Indeed, the objective element of an Eighth Amendment medical care claim is whether the plaintiff is suffering from a serious medical need, but the objective element of a conditions of confinement claim asks whether the plaintiff has been denied "the minimal civilized measure of life's necessities," *see Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013). Finally, most of Silva's complaints relate to the subjective qualities of the conditions of his confinement with lots of grey areas, likely to lead to uncertain and disruptive intrusion into the state's prison system.

The *Abbasi* Court also distinguished claims like that of the plaintiff under the Fifth Amendment against a warden for allowing prison guards to abuse prisoners, from the applicable Eighth Amendment standard for deliberate indifference to an inmate's need for medical care at issue in *Carlson*. 137 S. Ct. at 1863-64. More specifically, the Court pointed out that not only were different constitutional standards involved, but that the "Court has long made clear the standard for claims alleging failure to provide medical

treatment to a prisoner," while the standard for a claim against a warden who allowed prison guards to abuse prisoners "was less developed." *Id.* at 1864-65.

The same is true here. Silva's claim challenging the adequacy of his housing and the *Carlson* medical care claim are considered under very different standards, though both concern the same fundamental right under the Eighth Amendment to be free from cruel and unusual punishment. Accordingly, the legal analysis of Silva's Eighth Amendment claim does not involve evaluating basic medical care that he did or did not receive, nor the physical injury and pain caused, but rather the various physical conditions of Silva's unit and cell during the relevant time period, as well as the almost wholly subjective, emotional injury he claims to have suffered as a result.

Not surprisingly, multiple district courts have held that Eighth Amendment claims outside the field of medical care present new *Bivens* contexts. *See, e.g., Huerta v. Oliver*, No. 17-cv-988-RBJ-KLM, 2019 WL 399229, at *15 (D. Colo. Jan. 31, 2019) (Eighth Amendment claim challenging use of handcuffs with blackbox restraints constitutes a new *Bivens* context); *Lovett v. Ruda*, No. 17-cv-2010-PAB-KLM, 2018 WL 4659111, at *8 (D. Colo. Sept. 28, 2018) (Eighth Amendment conditions of confinement claim based on failure to provide adequately nutritional food arose from a different context than *Carlson*); *Mercer v. Matevousian*, No. 1:18-cv-265-DAD-BAM (PC), 2018 WL 3917969, at *4 (E.D. Cal. Aug. 14, 2018) (Eighth Amendment conditions of confinement claim related to handicap-accessible shower arose in different context than the claim in *Carlson*); *Bank v. United States*, No. 17-cv-609, 2017 WL 5591633, at *4 (N.D. Tex. Nov. 17, 2017) (finding that a pigeon infestation claim presented a new *Bivens* context).

7

Silva also argues that his claim is analogous to the *Bivens* claim approved by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994). However, the *Farmer* decision is unhelpful to him for at least two reasons. First, the Supreme Court merely assumed in *Farmer*, without analysis, that a federal prisoner could bring a *Bivens* claim against prison officials for failure to protect him from another inmate's assault and rape. *Id.* at 829-30. Generally speaking, however, even Supreme Court decisions that *assume* a *Bivens* claim do not constitute a new category of *Bivens* claim. *See Crowder v. Jones*, No. 14-cv-202, 2017, WL 2889717, at *2 (S.D. Ind. Nov. 29, 2017). Second, the legal claim in *Farmer* is distinct from Silva's claim here. Again, while the prisoner's claim in *Farmer* fell under the Eighth Amendment, the *Farmer* decision involved the question of whether officers acted with deliberate indifference to a specific risk that an inmate would be attacked, not alleged deliberate indifference to inadequate cell conditions generally. Accordingly, even assuming that the *Farmer* decision somehow constituted a fourth *Bivens* context or expanded *Bivens* and *Carlson*, Silva's Eighth Amendment claim is meaningfully different from the context considered in *Farmer*.

If anything, Silva's equal protection claim is somewhat analogous to *Davis* in that he is alleging that Braker discriminated against him on the basis of his race by placing him in an undesirable unit, but again there are meaningful differences between *Davis* and Silva's claim. For one, Silva's claim arose in the prison setting while the claim in *Davis* arose in the context of employment discrimination. The *Abbasi* Court itself noted that discrimination in the prison setting presents a new *Bivens* context by itself. *Abbasi*, 137 S. Ct. at 1858-60. Furthermore, defendant Braker is a correctional officer, while the federal

officer in *Davis* was a Congressman, meaning that these two defendants have very different relationships with and responsibilities towards the plaintiffs that sued them. *See Gonzalez*, 269 F. Supp. 3d at 58 (explaining that "the Supreme Court has refused to extend *Bivens* contexts beyond the specific clauses of the specific amendments for which a cause of action had been implied, or even to other classes of defendants facing liability under those same clauses" (citing *Davis*, 442 U.S. at 243-44, and *Schweiker v. Chilicky*, 487 U.S. 412, 428-29 (1988))).

Finally, Silva's First Amendment retaliation claim bears *no* resemblance to any of the claims previously deemed cognizable under *Bivens*. In particular, the *Abbasi* Court noted that it has never recognized a First Amendment *Bivens* claim. *See Abbasi*, 137 S. Ct. at 1857; *see also Wood v. Moss*, 134 S. Ct. 2056, 2066 (2014) (assuming, without deciding, that *Bivens* applied to a First Amendment claim); *Reichle v. Howards*, 132 S. Ct. 2088, 2093, n.4 (2012) (the Court "never held that *Bivens* extends to First Amendment claims"); *Iqbal*, 556 U.S. at 675 (citing *Bush v. Lucas*, 462 U.S. 367 (1983)) ("Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment."). Numerous district courts have followed suit with respect to First Amendment retaliation claims in particular. *See, e.g., Harris*, 2018 WL 3574736 at *2-*3 ("Nationwide, district courts seem to be in agreement that, post-*Abbasi*, prisoners have no right to bring a *Bivens* action for violation of the First Amendment." (quoting *Akande v. Philips*, No. 1:17-cv-01243-EAW, 2018 WL 3425009 at *8 (W.D.N.Y. July 11, 2018)) (comparing plaintiff's claims with claims in *Bivens*, *Davis*, and *Carlson*, and collecting Southern District of Indiana cases concluding that prisoners cannot bring a *Bivens* action for a First Amendment violation).

## II. Alternative, Existing Processes

The second inquiry is whether Silva has alternative processes available to address his claims, which also weighs heavily against implying a *Bivens* remedy. The Supreme Court noted in *Abbasi* that "if there is an alternative remedial structure present . . . that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action" because the alternative process may convincingly caution the Judiciary against "providing a new and freestanding remedy in damages." 137 S. Ct. at 1858. Accordingly, the Court cautioned, "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Id.* at 1863 (collecting cases).

Defendants note three alternative processes through which Silva could have sought relief: injunctive relief while he was still housed at FCI-Oxford; the Mandamus and Venue Act, 28 U.S.C. § 1361; and the Bureau of Prison's Administrative Remedy Process. The court agrees that each of these remedies were available to him, and weigh against implying a *Bivens* remedy to his claims here. First, defendants argue that Silva could have sought preliminary and permanent injunctive relief pursuant to the court's traditional equitable powers and sovereign immunity waiver of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. *See* 18 U.S.C. § 3626 (setting forth the guidelines courts must use in granting prospective relief with respect to prison conditions).

Specifically, the Seventh Circuit has recognized that prisoners may pursue equitable relief related to medical care at a BOP facility through the Administrative Procedure Act. *Robinson v. Sherrod*, 631 F.3d 839, 841 (7th Cir. 2011) ("federal inmates can in principle invoke the APA to obtain an order for medical treatment"). Second, if the conditions of

Silva's cell and safety were actually so egregious as to give rise to constitutional violations in a *Bivens* claim, there would appear no reason why he could not have invoked the Mandamus and Venue Act to compel BOP officials at FCI-Oxford to address those conditions. While injunctive relief may no longer available to Silva for any of his claims now that he has been transferred to FMC-Rochester, Silva does not dispute that these options were available to him before, and for that matter, even at the time he filed this lawsuit. Third and finally, defendants point to the BOP's Administrative Remedy Process Program, which "allow[s] an inmate to seek formal review of an issue relating to any aspect of his/her own confinement," and "applies to all inmates in institutions operated by the Bureau of Prisons." Administrative Remedy Program Purpose and Scope, 28 C.F.R. § 542.10(a)-(b) (2018). While an institution's warden is responsible for "[e]stablish[ing] procedures" to address requests and appeals, including "investigating and responding," 28 C.F.R. § 542.11(a)(1) (2018), Silva does not dispute the availability of this program at FCI-Oxford during the relevant time period.[2]

Instead, Silva argues that injunctive relief is inadequate and that he could not access the BOP's administrative program because of "defendant's misconduct." Taking the latter argument first, Silva's assertion that he could not access the BOP's Administrative Remedy Process Program is unavailing. As noted, Silva did not dispute that the process was available to him. As for its adequacy, Silva is not entitled to the remedy of his choice, even if he considers it to be inferior. *See Robinson*, 631 F.3d at 842 (monetary damages "is not

---

[2] The BOP's Administrative Remedy Program has been available since well before Silva's incarceration at FCI-Oxford. *Id*.

11

an automatic entitlement no matter what other means there may be to vindicate a protected interest") (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). As the Supreme Court stated in *Bush v. Lucas*, the alternative procedure inquiry does not ask whether the remedy available to the plaintiff offers "complete relief." 462 U.S. 367, 388 (1983). Accordingly, since the undisputed facts establish that Silva had another alternative process available to him, this factor weighs against expanding *Bivens* to his claims. *See Gonzalez*, 269 F. Supp. 3d at 60, 63 (declining to expand *Bivens* cause of action for Eighth Amendment conditions-of-confinement and Fifth Amendment due process claims because administrative complaint process and other "special factors" counseled against expansion); *Goree v. Serio*, 735 Fed. App'x 894, 895 (7th Cir. 2018) ("Where Congress has established an alternative remedial structure to protect a constitutional right, the Supreme Court has strongly cautioned that the courts should not create a secondary remedy." (citing *Abbasi*, 137 S. Ct. at 1857-58)); *Vega v. United States*, 724 Fed. App'x 536, 539 (9th Cir. 2018) (affirming district court's refusal to extend *Bivens* to prisoner plaintiff's access to courts and due process claims based on finding that plaintiff had adequate alternative processes available to him).

With respect to Silva's retaliation claim in particular, the court might be more skeptical of the availability of the BOP's administrative remedy if he claimed Braker retaliated against him for using those procedures, but Silva is proceeding on the theory that Braker retaliated against him for filing *this* lawsuit. In any event, as previously discussed, the majority of courts considering whether a retaliation claim stemming from the use of the BOP's administrative remedy have concluded that a *Bivens* claim is not

available for a First Amendment retaliation claim, including the Third Circuit in *Bistrian v. Levi*, 912 F.3d 79, 89-94 (3d Cir. Dec. 28, 2018) (refusing to extend *Bivens* claims after *Abbasi* to cover retaliation claim of pretrial detainee).[3]

## III. Additional Special Factors

Finally, the "special factors" analysis weighs heavily against implying *Bivens* remedies here as well. *See Abbasi*, 137 S. Ct. at 1865. As the *Abbasi* Court instructed, "a *Bivens* remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Id.* at 1857 (quoting *Carlson*, 446 U.S. at 18). This "inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1858. In particular, a "special factor counselling

---

[3] *See also Vanaman v. Molinar*, No. CV-17-00222-TUC-JGZ, 2018 WL 4698655, at *4 (D. Ariz. Sept. 28, 2018) (relying in part on BOP administrative remedy process and special factors to counsel against extending *Bivens* to First Amendment claims); *Early v. Shepherd*, No. 2:16-cv-00085-JMS-MJD, 2018 WL 4539230, at *15-*16 (S.D. Ind. Sept. 21, 2018) (finding retaliation claim "foreclosed" by *Abbasi* and recognizing alternative remedies -- including the BOP administrative process -- to address claim); *Gonzalez v. Bendt*, No.4:16-cv-04038-KES, 2018 WL 1524752, at *3-*4 (D.S.D. Mar. 28, 2018) (declining to extend *Bivens* to retaliation claim where plaintiff alleged prison official "retaliated by not providing [him] with required administrative forms when [plaintiff] tried to utilize the administrative process a second time" because "the cost, time and energy associated with defending" such a case would be "significant"), *appeal docketed*; *Andrews v. Miner*, 301 F. Supp. 3d 1128, 1134-36 (N.D. Ala. 2017) (declining to allow plaintiff's *Bivens* retaliation claim to proceed, as it was a new *Bivens* context, there were alternative remedial processes, including that provided by the BOP); *Rodriguez v. Hamel*, No. 15-cv-7980 (NHL)(KMW), 2018 WL 2254557, at *4-*5 (D. N.J. May 15, 2018) (granting motion to dismiss plaintiff's First Amendment retaliation claim even though there were no alternative remedial processes for damages available because "prison housing and the prison workplace are special factors precluding the extension of *Bivens*"); *McLean v. Gutierrez*, No. ED CV 15-275-RGK (SP), 2017 WL 6887309, at *8 (C.D. Cal. Sept. 28, 2017) (explaining that "a hostile interaction between a prisoner and prison staff does not necessarily render the grievance system unavailable, even if a threat of violence was included") (citing *McBride v. Lopez*, 807 F.3d 982, 988 (9th Cir. 2015) (addressing unavailability of grievance process)).

hesitation" should cause the court to "hesitate before answering that question in the affirmative." *Id.* As the Court explained in *Abbasi*,

> if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts *must* refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal court jurisdiction under Article III.

*Id.* (emphasis added). Defendants identify five such special factors here.

### A. Interference with Sensitive Government Functions

To start, defendants argue that that implying a *Bivens* remedy to Silva's claims would interfere with the "delicate process of prison administration." The Supreme Court has recognized that prison administration is immensely challenging, requiring "expertise, planning and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S. 78, 84-85 (1987). For that reason, the Court encouraged "a policy of judicial restraint" in the area of prison administration in *Turner. Id.* at 85. While Silva's retaliation claim stems from his belief that Braker told other inmates to threaten him, an allegedly arbitrary and malicious act that had nothing to do with proper prison administration, Silva's claims principally relate to his cell placement and other conditions directly related to defendants' discretionary administrative decisions. More broadly, Silva's challenge to BOP decisions regarding how to allocate resources to FCI-Oxford to ensure adequate housing conditions run squarely counter to *Turner*. While this factor may weigh slightly less heavily against implying a new remedy given the claimed threat of harassment, it is, at best, neutral.

## B. Congress' has Regulated the Prison Field Extensively without Creating Damages Remedies

Defendants also advance a more direct separation of powers analysis, based on the admonition in *Abbasi* that "separation-of-powers principles are or should be central to the analysis"; recognizing that in considering whether any cause of action should be implied by the courts, Congress is "most often" in the best position to decide if a damages remedy serves the public interest. 137 S. Ct. at 1857. Moreover, defendants note several instances in which Congress *has* regulated the field of prison administration and prisoners' rights without creating a private remedy for federal inmates to pursue monetary damages against prison officials. First, the Civil Rights Act of 1871, 42 U.S.C. § 1983, created a private cause of action against state officials for constitutional violations. Despite the Supreme Court's creation of an analogous cause of action in 1971 in *Bivens*, Congress has not since taken the opportunity to fill in that gap, and perhaps for that reason, the Supreme Court has since stepped back from implying a new cause of action against federal officers. *See Vance v. Rumsfeld*, 701 F.3d 193, 198 (7th Cir. 2012) ("[w]hatever presumption in favor of a *Bivens*-like remedy may once have existed has long since been abrogated"); *Robinson*, 631 F.3d at 842 ("*Bivens* is under a cloud, because it is based on a concept of federal common law no long in favor in the courts").

In fact, since *Bivens*, Congress has only taken steps that *limit*, not broaden prisoner rights. For example, when it promulgated the Civil Rights of Institutionalized Persons Act of 1980 ("CRIPA"), 42 U.S.C. § 1997a, Congress created a "weak exhaustion provision, which authorized district courts to stay actions" for a limited period of time while a prisoner exhausted his claims using the administrative remedies available. *Woodford v. Ngo*,

548 U.S. 81, 84 (2006). Then in 1995, more substantively, Congress promulgated the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1997e. As the *Abbasi* Court noted, the PLRA "made comprehensive changes to the way prisoner abuse claims must be brought in federal court," afforded Congress the "specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs," and arguably "suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Id.* at 1865. As the *Abbasi* Court warned, "Congress' failure to provide a damages remedy might be more than mere oversight, and that congressional silence might be more than 'inadvertent'"; with that "possibility counsel[ing] hesitation 'in the absence of affirmative action by Congress.'" *Id.* at 1862 (internal citations omitted).

Defendants further argue that an intended effect of the PLRA has been to limit prisoner litigation and relieve the legal system from the burden of supervising the daily operations of prisons by: (1) requiring exhaustion of available administrative remedies before bringing suit, 42 U.S.C. § 1997e(a); (2) barring prisoners from recovering for "mental or emotional injury" unless they show a "physical injury" or "sexual act, 42 U.S.C. § 1997e(e); and (3) prohibiting prisoner from proceedings *in forma pauperis* if they have filed three or more prior actions that were dismissed without legal basis, 28 U.S.C. § 1915(g). Each of these limitations certainly suggest that Congress intended to reign in prisoners' ability to obtain relief in federal court, not expand it. *See also Badley v. Granger*, No. 2:17-cv-41-JMS-DLP, 2018 WL 30226553, at *4 (S.D. Ind. June 18, 2018)

("Congress has been active in the area of prisoners' rights, and its action -- not creating new rights -- do not support the creation of a new *Bivens* claim.").

Finally, defendants argue that in passing the Prison Rape Elimination Act of 2003 ("PREA"), Congress again sought to address the substantial problem of prison sexual assaults, but again declined to create a private cause of action in doing so. Similarly, defendants noted Congress's explicit delegation to the Attorney General and the BOP of protecting, disciplining and housing federal inmates, 18 U.S.C. § 4042(a). With respect to housing in particular, Congress also gave the BOP exclusive authority to house prisoners wherever it deems "appropriate and suitable," 18 U.S.C. § 3621(b). Not only that, Congress explicitly eliminated the judiciary's ability to "review certain decisions made by BOP officials" under the APA. 18 U.S.C. § 3625.

Because Silva offered no counters to these varied examplse in which Congress has not only declined to create new causes of action against federal prison officials, but actually restricted or eliminated such causes, the separation of powers factor weighs heavily against implying a *Bivens* remedy for Silva's claims.

### C. System-Wide Costs & Effect on Duty-Performance

Defendants also argue that the system-wide costs resulting from the extension of *Bivens* remedies to Silva's claims. Before extending these remedies, the *Abbasi* Court cautioned consideration of the "impact on governmental operations systemwide," including "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation

and implementation of public policies." 137 S. Ct. at 1858. Likewise, the Court warned that creating a *Bivens* cause of action may result in officers "refrain[ing] from taking urgent and lawful action in a time of crisis," plus "the costs and difficulties of later litigation might intrude upon and interfere with the proper exercise of their office." *Id.* at 1863.

Defendants point out that the BOP faces significant staffing shortages in addition to heavy workloads, since its staffing levels have been reduced in recent years. Citing to the BOP's FY2018 Budget Report, defendants note that there are now just 37,000 BOP employees responsible for monitoring a prisoner population of approximately 184,000 prisoners. Defendants argue that the BOP may face an even steeper uphill battle recruiting new prison staff if faced with the possibility of dealing with defending themselves against lawsuits for general housing decisions. This dovetails with defendants' last point: requiring the BOP and the Department of Justice to defend these actions, many of which could be frivolous, stands to divert substantial resources away from orderly prison administration. While more speculative than other factors, the court agrees that this factor also weighs against implying a *Bivens* remedy here.

### D. Workability

Defendants next contend that Silva's particular types of claims further weigh against extending *Bivens* because to succeed on his claims, he would need to garner proof that is extremely fact-intensive and relies heavily on the defendants' state of mind. Specifically, Silva would need to come forward with evidence related to the specific conditions in his cell and unit during the relevant time period, what each defendant knew Silva was experiencing, defendants' state of mind in assigning Silva or others to his unit, and what

18

Braker actually said to other prisoners. Ultimately, if Silva relies primarily on his memory, these materials issues would become a swearing contest between the parties that "necessitate [a trial] and further increase litigation costs." *See Andrews*, 301 F. Supp. 3d at 1135 ("First Amendment retaliation claims, requiring inquiry into a defendant's subjective state of mind, often would present genuine issues of material fact . . . ."). Likewise, claims that are easy to state but hard to prove weigh against extension of *Bivens*. *See Abassi*, 137 S. Ct. at 1864-65.

E. **Chilling Effect of *Bivens* Remedies on Discharge of Prison Duties**

The final factor defendants point to as weighing against extending *Bivens* remedies to Silva's claims was alluded to above: the threat of personal liability standing in the way of prison officials executing their duties to their utmost degree. *Abbasi*, 137 S. Ct. at 1863; *De La Paz v. Coy*, 786 F.3d 367, 379 (5th Cir. 2015) ("Faced with a threat to his checkbook from suits based on evolving and uncertain law, the officer may too readily shirk his duty."). Certainly prison officials would receive the benefit of qualified immunity in circumstances in which they did not violate clearly established law in carrying out their duties, but there is a substantial difference between being insulated from suit for monetary damages as a matter of law and successfully defending against a lawsuit after developing a factual record. Accordingly, this factor, along with the four others, also counsels against implying a *Bivens* remedy here.

On balance, the court agrees that it cannot imply a *Bivens* claim to any of Silva's

claims in this lawsuit. Accordingly, the court is granting defendants' motion to dismiss.[4]

ORDER

IT IS ORDERED that:

(1) Plaintiff Natividad Silva's motion to transmit testimony (dkt. #29) is DENIED as moot.

(2) Defendants' motion to dismiss (dkt. #32) is GRANTED.

(3) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 26th day of September, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[4] Defendants also seeks dismissal of Silva's First and Eighth Amendment claims on qualified immunity grounds, and Silva's First Amendment claim for failing to allege more than a *de minimus* injury. Since the court finds dismissal appropriate because Silva's claims are not cognizable, the court need not consider these arguments.